## Lancaster Yellow Cab & Baggage, Inc., *v.* Pennsylvania Labor Relations Board, Appellant.

Argued April 17, 1952. Before DREW, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*George L. Reed*, Solicitor, with him *M. Louise Rutherford*, Deputy Attorney General, and *Robert E. Woodside*, Attorney General, for appellant.

*George B. Balmer*, with him *W. Hensel Brown* and *Snyder, Balmer & Kershner*, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, May 29, 1952:

This is an appeal from a final decree of the lower court dismissing an appeal by the Lancaster Yellow Cab & Baggage, Inc. (hereinafter called the "Company") from an order of the Pennsylvania Labor Relations Board (hereinafter called the "Board"), and directing the Company to comply with the order as modified by the court. In dismissing the appeal the court below sustained an exception by the Company and overruled the Board as to that portion of its order which directed the Company, upon request, to reinstate certain named employes without back pay. The appeal here is taken by the Board and is concerned only with the lower court's ruling that the Board should not have ordered reinstatement of the employes.

The employes that the Board ordered reinstated were the Company's night taxicab drivers. The facts as taken from the Board's findings are as follows: During the day of June 9, 1949, a dispute arose between the Company management and the day cab drivers. The next day, after attempts by the business agent of the Union (the bargaining agent of the employes) to contact the president and secretary of the Company and its attorney, the day cab drivers, in violation of a collective bargaining agreement which was then in effect, parked their cabs and refused to work. When the night cab drivers arrived for work on June 10, 1949, their trip cards were not available and they were told by the manager in the presence of the president that there was no work. On June 11th and June 13th a supervisor for

the Company solicited the employment of other men who had been used during a previous strike. The Company then by its attorney informed the Union that it refused to discuss the grievance of the cab drivers (both day and night shift) which it was required to do under the collective bargaining agreement. Further letters between the Union and the Company resulted in no change in position by either party and on July 5, 1949, the Company informed one of the day drivers that he was dismissed and one of the night shift drivers that he was no longer considered an employe.

On August 1, 1949, a charge of unfair labor practices under Section 6, subsection (1), clauses (a) and (e), of the Pennsylvania Labor Relations Act, as amended, was filed with the Board by the Union and a complaint was issued on August 2, 1949. After a hearing the Board entered a *nisi* decision on March 29, 1950, which, in substance, ordered the employer to cease and desist from discriminating against employes in regard to hire and tenure of their employment because of their membership in the Union, to bargain collectively and to reinstate the night shift drivers without back pay. Exceptions were dismissed and a final order entered October 26, 1950. A petition for review was filed by the Company and a petition for enforcement of the order was filed by the Board. The lower court after argument modified the order in the manner above stated.

The issue involved herein is a narrow one and requires only an answer to the question whether the Pennsylvania Labor Relations Board may properly direct an employer who has been found guilty of unfair labor practices within the meaning of Section 6, subsection 1, clauses (a) and (e), but who has not been charged with an unfair labor practice under clause (c) of such section, to reinstate without back pay em-

ployes who were not permitted by the employer to return to work and who were later discharged.

Subsection 1 of Section 6 of the Pennsylvania Labor Relations Act of 1937, as amended, 43 PS §211.6, under which the controversy arises, in six clauses, (a), (b), (c), (d), (e), and (f), defines unfair labor practices by the employer. The particularly pertinent clauses are (a), (c) and (e), which read as follows: "(a) To interfere with, restrain or coerce employes in the exercise of the rights guaranteed in this act. . . . (c) By discrimination in regard to hire or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this act, or in any agreement approved or prescribed thereunder, or in any other statute of this Commonwealth, shall preclude an employer from making an agreement with a labor organization (not established, maintained or assisted by any action defined in this act as an unfair labor practice) to require, as a condition of employment, membership therein, if such labor organization is the representative of the employes, as provided in section seven (a) of this act, in the appropriate collective bargaining unit covered by such agreement when made and if such labor organization does not deny membership in its organization to a person or persons who are employes of the employer at the time of the making of such agreement, provided such employe was not employed in violation of any previously existing agreement with said labor organization. . . . (e) To refuse to bargain collectively with the representatives of his employes, subject to the provisions of section seven (a) of this act."

Admittedly, the employer was not charged with an unfair labor practice under clause (c). Section 8, clause (c) of the original Pennsylvania Labor Relations Act of June 2, 1937, P. L. 1168, was amended by the

Act of June 9, 1939, P. L. 293, 43 PS §211.8, so as to provide as follows: ". . . If, upon all the testimony taken, the board shall determine that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, the board shall state its findings of fact, and issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such *reasonable* affirmative action, including reinstatement of employes *discharged in violation of clause (c) of subsection (1) of section six of this act,* with or without back pay, as will effectuate the policies of this act. . .". (The italicized words indicate the amendment made by the 1939 act). The amendment thus makes it clear that it is only when employes have been "discharged in violation of clause (c) of subsection (1) of section six" of the act that the Board is given the power to order reinstatement. In fact, it is difficult to imagine any other reason for the Legislature's amendment of the act.

Appellant cites numerous federal decisions under the Taft-Hartley and Wagner Acts which give the National Labor Relations Board the power here contended for. But the plain answer to reliance upon these decisions is found in a comparison of the statutes. Subsection (c) of section 10 of the National Labor Relations Act, 29 U. S. C. A. §160, reads exactly the same in pertinent part as clause (c) of Section 8 of the original Pennsylvania Labor Relations Act of 1937, and has never been amended to read as our law does by virtue of the amendatory Act of 1939.

Counsel for the Board contends that clause (a) of Section 6, subsection (1) includes in its broad terms all of the other clauses and that it is only necessary to set forth a violation of that clause and the Board then has the power to find a violation of clause (c) or any of the other four clauses. With this conten-

tion we disagree. Although the strict rules of pleading do not apply to proceedings before an administrative board (*Kochinsky v. Independent Pier Company et al.,* 157 Pa. Superior Ct. 15, 18, 41 A. 2d 409), the employer charged with an unfair labor practice is entitled to know which one of the six unfair labor practices enumerated in the act is the basis for the complaint just as the Union is entitled to be specifically apprised as to which one of the five unfair labor practices in the present act it or its constituents may be alleged to have violated together with the possible consequences of a finding of such specific violation.

At the hearing the Union moved to amend the complaint by adding to one paragraph the statement that the employer was guilty of a violation of the enumerated clauses (a) and (e) "by refusing employment or otherwise locking out" named employes. The Company objected to the amendment. No ruling was made by the trial examiner but the Board ruled the amendment to be improper because it averred a new cause of action more than six weeks after its alleged occurrence.[1] Nowhere does this proposed amendment specifically charge the Company with a violation of clause (c) of Section 6, subsection 1. Counsel for the Board, however, contends that this amendment was for the purpose of charging the Company with a violation of clause (c) and the Board erred in disallowing the amendment.

The basis for the charge of lockout and refusal of employment occurred June 10, 1949. This date was not only more than six weeks before the time the amendment was proposed (August 19, 1949) but also more

---

[1] Section 9, subsection (e) of the Pennsylvania Labor Relations Act, as amended, 43 PS §211.9, provides that ". . . No petition or charge shall be entertained which relates to acts which occurred or statements which were made more than six weeks prior to the filing of the petition or charge."

than six weeks before August 1, 1949, the date the original charge was filed.[2] Under such circumstances the instant case is distinguishable from the two cases relied upon by appellant (*National Labor Relations Board v. Kobritz et al.,* 193 F. 2d 8 and *Cusano v. National Labor Relations Board,* 190 F. 2d 898). In those cases, while the two United States Courts of Appeals held that the National Labor Relations Board was correct in allowing a specific amendment to the charge although the six months period provided for by Section 10(b) of the Labor Management Act had expired at the time the amendment was allowed, *the original charge was filed within the six month period.*

We conclude that the lower court correctly modified the order of the Board.

Order affirmed. Costs to be paid by appellant.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The technical discussion of the majority opinion on numbered subsections and lettered clauses of the Pennsylvania Labor Relations Act does not change the simple unadorned fact that the Lancaster Yellow Cab & Baggage, Inc., violated that Act by locking out employes with whom it had a binding contract not to do that very thing. Nor does the involved, interlacing exposition of the majority opinion, which sometimes carries the argument into the penumbra of legal cryptography, alter the uncontested and uncontestable proposition that six employes, under a solemn compact to work, were driven from their employment and replaced by strikebreakers.

Stripping away the tangled net of technicalities in which this case has been enmeshed, we find the follow-

---

[2] As to the charges under clauses (a) and (e) of Section 6, subsection 1, the circumstances on which they were based occurred within the six week period.

ing set of circumstances. On August 16, 1948, the Lancaster Yellow Cab & Baggage, Inc., and the Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local 771, A. F. of L., entered into a one year collective bargaining contract which provided, inter alia, that in the event of a dispute between the company and the union, both parties would submit their positions on the dispute to a hearing and eventual arbitration. On June 9, 1949, a controversy arose over one of the cab drivers, one Harold Laukhuff, who, when reporting for work the following day was told to "go home until sent for." The day drivers then stopped work but upon orders from their union representative returned to their cabs to work until the grievance over their fellow-employe should be adjusted. The company refused to hear or consider the grievance and the day drivers again left their cabs.

That evening when the six night drivers reported for duty, no trip cards were available and they were refused work. On June 11th and June 13th the company solicited men for employment to take the jobs of the union men. The union insisted on a hearing under the terms of the contract, but the company refused to negotiate. On June 16th the company notified the union of its intention to terminate its agreement with the union at the end of the term on August 15, 1949.

In its decision after hearing testimony on the merits of the entire controversy the Board declared: "In the instant case we find the employer not free from fault. It violated all accepted practices of collective bargaining and industrial relations when it suspended Laukhuff from service without first notifying the union or the employe as to the cause. In spite of the quick and effective action of the union in terminating the work stoppage in the morning, the employer did not give the union a similar opportunity when the day shift suspended work in the afternoon. . . .

"When the night shift reported for work, even though the respondent through its attorney had been previously advised the night shift would work, the employer offered the drivers no work assignments and no opportunity to work. Afterwards, the employer resisted all efforts of the union to meet to settle the dispute and terminate the work suspension and advised the employes, of both the day and night shifts, that it assumed they had quit their jobs and they had been replaced. Even when two employes called the office of the employer to inquire about work, they were told there was no work and one was referred to the union.

"The conclusion is inescapable, from a reading of the entire record, that the employer decided to take advantage of the impetuous and unauthorized act of the day shift to weaken the position of the union and possibly terminate its right to represent and bargain for the employes."

Under these circumstances the Board ordered the company to cease and desist from discriminating against its union employes, to forthwith bargain collectively with the union with reference to the grievance complained of by the union, and to reinstate upon request the six night cab drivers, found to be without fault whatsoever.

The lower court and the majority opinion of this Court do not say that the Board erred in its findings that the six night cab drivers were the victims of unfair labor practices on the part of the employer, but maintain that the union could not amend its pleadings to include a charge of violation of the Act under clause (c) of Section 6, subsection 1. But it is to be noted that the amended charge and the original charge were based on *precisely the same fact situation.* Furthermore, the decision of the Board ordering the reinstatement of the night cab drivers can be supported by the charge of violation of Section 6, subsection 1, clause

(a) and (e), equally well as by charging violation of clause (c).

The Board properly appraised the situation when it said: "Since the contract was binding between the parties during the entire time the Union endeavored to get the employer to meet to adjust or arbitrate the dispute, the employer had the positive duty, during such period, to *recognize the union.*" (Italics supplied)

To argue that the pleadings must show that clause (c), as well as (a) and (e) were violated when by its action the Company sought to destroy the *entire* contract of collective bargaining with the union, is like the defendant in a criminal trial demanding to know which specific ones of his numerous blows felled his victim when it is admitted that he is the only one who struck blows at all. The United States Supreme Court said in *Republic Aviation Corp. v. National Labor Relations Board,* 324 U. S. 793, 65 S. Ct. 982, that: "The Wagner Act [after which the Pennsylvania Labor Relations Act is patterned] . . . left to the Board the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms. *Thus a 'rigid scheme of remedies' is avoided and administrative flexibility within appropriate statutory limitations obtained to accomplish the dominant purpose of the legislation. . ."* (Emphasis supplied.)

In *N. L. R. B. v. Piqua Munising Wood Products Co.,* 109 F. (2d) 552, 557, the United States Circuit Court said: "All that is requisite in a valid complaint before the Board is that there be a plain statement of the things claimed to constitute an unfair labor practice that respondent may be put upon his defense."

That the employer here well knew of the charge of discrimination against it is evidenced by the fact that in its answer it denied that the six night drivers were

unjustly discriminated against and asserted that they had left their jobs voluntarily.

The decision of the Board was fair and impartial. It found that the day drivers had violated the non-strike provisions of the agreement with the company and they had, therefore, ceased to be employes within the meaning of the statute. And then, in finding that the night drivers had been improperly discharged and were entitled to their jobs, it could have ordered the company to compensate them for back pay. But it did not do this.

To now hold that the company is not even required to reemploy men it had discharged because of union activity is perhaps to encourage some other employers to play at ducks and drakes with the right of collective bargaining which has been gained by the working man only after decades and centuries of blood, sweat and toil.

To strike down an earnest contract and deprive men of the right of employment guaranteed to them by a solemn act of the General Assembly of the people—all because of a letter of the alphabet—is to arm Technicality with a longer sword than it wielded in the severest of despotic Draconian days.