GENERAL ELECTRIC COMPANY, X-RAY DEPARTMENT, Appellant, vs. WISCONSIN EMPLOYMENT RELATIONS BOARD, Respondent. [Two cases.] *

*February 3—February 28, 1958.*

* Motion for rehearing denied, without costs, on May 6, 1958.

228

For the appellant there were briefs by *Quarles, Herriott & Clemons,* attorneys, and *John G. Kamps, Laurence C. Hammond, Jr.,* and *James A. Urdan* of counsel, all of Milwaukee, and oral argument by *Mr. Kamps* and *Mr. Hammond.*

For the respondent there was a brief by the *Attorney General* and *Beatrice Lampert,* assistant attorney general, and oral argument by *Mrs. Lampert* and by *Mr. Robert E. Gratz* of Milwaukee of counsel.

STEINLE, J.   General Electric Company, X-Ray Department, manufacturer of X-ray equipment at Milwaukee and District No. 10 of the International Association of Machinists, A. F. L., a voluntary and unincorporated labor organization (also referred to herein as the "union"), were parties to a collective-bargaining agreement executed October 27, 1952, which was effective at the time referred to herein. By complaint verified June 17, 1955, and filed with the Wisconsin Employment Relations Board pursuant to provisions of sec. 111.07 (2), Stats., the union charged the company with unfair labor practices involving violations of the collective-bargaining agreement under sec. 111.06 (1) (f). The board determined that six of the union's charges had no merit, but that the company had violated the contract in four particulars. By separate judgments the trial court (a) dismissed the company's petition for review, and (b) directed conformation and enforcement of the board's order.

The issue upon this appeal from the judgments relates to but one charge asserted in the complaint, neither party having sought review here of other items determined by the trial court.

Specifically the third paragraph of the complaint, in relation to which the controversy centers, is stated as follows:

"That the company violated the seniority and transfer provisions of the agreement by transferring two employees from department F against their will and two employees from department L. Said grievance D–5–2 further constitutes a violation of the layoff and recall provisions of the agreement and that the company was and now still is in violation of those particular provisions in the grievance afore-mentioned."

By answer the company asserted:

"As to the third paragraph, denies the transfers complained of in grievance D–5–2 violated the seniority and transfer or the layoff and recall provisions of the agreement and states in any event such transfers lasted only one month and were necessary to supply (on pending work) skills needed at once and not otherwise available."

It appears without dispute from the evidence adduced before the board that on March 4, 1955, the company temporarily transferred two women employees, Audrey Czaplewski and LaVerne Ripinski, from department F to department XA, and that to replace them, the company transferred two men, Howard Komm and Leo Bocziewicz, from department L to department F. The temporary transfers were necessitated by urgent need for production in department XA. Each of the employees so affected had previous experience in the department to which they were transferred. They were incentive workers, which under the terms of the collective-bargaining agreement meant that they were to be paid a premium for the quantity of work produced by them over a fixed standard. When the union was notified of the transfers, its representative informed the company that the union would

make no objection in the event that the transfers were satisfactory to the employees involved. However, the employees protested, and the union submitted a "grievance" pursuant to the grievance provisions of the contract. The said "grievance" was denominated D–5–2. It was processed through steps specified in the contract. After such processing failed to resolve the dispute, the union filed the complaint in question with the board. However, before the filing of such complaint, the company had retransferred the employees to their former departments. The retransfer was made on April 4, 1955.

The collective-bargaining agreement provided in part:

## "Article XI

### "*Incentive Plan, Principles, and Objectives.*

"Section 1. Incentive bonus pay shall be defined as additional money offered as a reward for additional productivity. The incentive bonus will be paid solely for productivity in excess of 80% of the established time standards.

"Section 2. Incentive bonus payments shall start when performance exceeds 80% of the established time standards and will increase at the uniform rate of $1\frac{1}{4}\%$ of each participant's basic hourly wage rate for every 1% increase in productivity above 80%, continuing to and above 100%, in accordance with the table below.

| % Productivity | % Bonus | % Productivity | % Bonus |
|---|---|---|---|
| 80% or less | None | 92% | 15% |
| 81% | $1\frac{1}{4}\%$ | 93% | $16\frac{1}{4}\%$ |
| 82% | $2\frac{1}{2}\%$ | 94% | $17\frac{1}{2}\%$ |
| 83% | $3\frac{3}{4}\%$ | 95% | $18\frac{3}{4}\%$ |
| 84% | 5% | 96% | 20% |
| 85% | $6\frac{1}{4}\%$ | 97% | $21\frac{1}{4}\%$ |
| 86% | $7\frac{1}{2}\%$ | 98% | $22\frac{1}{2}\%$ |
| 87% | $8\frac{3}{4}\%$ | 99% | $23\frac{3}{4}\%$ |
| 88% | 10% | 100% | 25% |
| 89% | $11\frac{1}{4}\%$ | 101% | $26\frac{1}{4}\%$ |
| 90% | $12\frac{1}{2}\%$ | 102% | $27\frac{1}{2}\%$ |
| 91% | $13\frac{3}{4}\%$ | Etc. | Etc. |

"Section 3. The same base pay rate shall apply to both day work and incentive work pay."

The "Wage Supplement" of the collective-bargaining agreement in so far as material provides in part:

## "Article I

### "Wages.

"1. Employees covered by this agreement shall be paid the following hourly wage rates:

#### "Basic Hourly Wage Rates

| Labor Grade | Automatic Progression Min. | 4 Wks. | 13 Wks. | Merit Steps | | | |
|---|---|---|---|---|---|---|---|
| 1 | 1.165 | 1.215 | 1.265 | 1.315 | | | |
| 2 | 1.215 | 1.265 | 1.315 | 1.365 | | | |
| 3 | 1.265 | 1.315 | 1.365 | 1.42 | | | |
| | | 9 Wks. | 18 Wks. | | | | |
| 4 | 1.265 | 1.315 | 1.365 | 1.42 | 1.47 | | |
| 5 | 1.315 | 1.365 | 1.42 | 1.47 | 1.525 | | |
| 6 | 1.365 | 1.42 | 1.47 | 1.525 | 1.585 | | |
| 7 | 1.42 | 1.47 | 1.525 | 1.585 | 1.645 | | |
| 8 | 1.47 | 1.525 | 1.585 | 1.645 | 1.705 | | |
| 9 | 1.525 | 1.585 | 1.645 | 1.705 | 1.765 | 1.825 | |
| 10 | 1.585 | 1.645 | 1.705 | 1.765 | 1.825 | 1.885 | |
| 11 | 1.645 | 1.705 | 1.765 | 1.825 | 1.885 | 1.94 | |
| | | 13 Wks. | 26 Wks. | | | | |
| 12 | 1.705 | 1.765 | 1.825 | 1.885 | 1.94 | 2.00 | |
| 13 | 1.765 | 1.825 | 1.885 | 1.94 | 2.00 | 2.06 | |
| 14 | 1.825 | 1.885 | 1.94 | 2.00 | 2.06 | 2.12 | |

"2. . . .

"3. When an employee is temporarily transferred, at the request of the company, to a lower job classification, he shall continue to receive his rate previous to the transfer.

"4. When an employee is temporarily transferred, at the request of the company, to a higher job classification, he shall continue to receive his rate previous to the transfer or the starting rate of the classification, whichever is higher.

"5. A 'temporary transfer' shall be defined to be a transfer of less than ninety days' duration."

Germane to a consideration of the issues on this appeal are the following findings of fact, conclusions of law, and the order of the board as affirmed by the trial court.

### "Findings of Fact.

"5. That on October 26th, 1953, LaVerne Ripinski commenced her employment with the employer as an 'assembler C' in department F; that on April 19th, 1954, Ripinski was promoted to an 'assembler B' in the same department and continued in that classification and department until January 17th, 1955; that on November 2d, 1953, Audrey Czaplewski commenced her employment with the employer as an 'assembler C' in department F; that on April 19th, 1954, Czaplewski was promoted to an 'assembler B' in the same department and continued in that classification and department until January 17th, 1955; that Howard Komm commenced his employment with the employer on May 25th, 1948, as a 'packing room helper' in department 7; that Komm continued his employment in various departments in various classifications, and from April, 1951, to January 12th, 1955, he was employed in department 7P as a 'packer and crater A;' that Leo Bocziewicz commenced his employment with the employer on November 12th, 1951, as a 'packer and crater A' in department 7P and continued in that department until January 12th, 1955, at which time he was classified as 'merchandise packer.'

"(a) That on January 12th, 1955, due to a lack of work in department 7P, the employer transferred Komm and Bocziewicz to department F, both of whom were then given the classification of 'assembler B;' that on January 17th, 1955, because of the Komm and Bocziewicz transfers, the employer transferred Czaplewski to department DPA, as an 'assembler B (temporary)' and Ripinski to department XA as an 'X-ray tube assembler C;' that on January 31st, 1955, Czaplewski was transferred to department XA as an 'X-ray tube assembler B' and on the same date Ripinski's classification was raised to 'X-ray tube assembler B.'

"(b) That shortly after January 31st, 1955, the union filed grievances protesting the transfers of Ripinski and Czaplewski, wherein the union contended that employees, in other departments, having less seniority than Ripinski and

Czaplewski should have been transferred or laid off to make room for Komm and Bocziewicz and that the employer erred in making such transfers; that on February 28th, 1955, after various grievance meetings, the employer acknowledged that Ripinski and Czaplewski should not have been bumped; and that on the latter date, Ripinski and Czaplewski were returned to department F and Komm and Bocziewicz were transferred to department L.

"(c) That on March 4th, 1955, the employer again transferred Ripinski and Czaplewski to department XA for the reason that there was an urgent need for tube assemblers in that department and that these two employees were the only employees who had the skill and ability to perform the work; that the employer thereupon transferred Komm and Bocziewicz into department F to replace the two afore-mentioned ladies, for the same reason; that the two afore-mentioned ladies remained in department XA from March 4th, 1955, to April 4th, 1955, during which period Ripinski spent a total of 188 hours, all on tube assembly, and Czaplewski spent a total of 192 hours, 176 of which were on tube assembly; that Komm and Bocziewicz remained in department F until April 4th, 1955, that during the period from March 4th, 1955, to April 4th, 1955, while the four named employees were working outside of their respective departments, although receiving their normal hourly wage rate, they were unable to earn the amount of incentive earnings which they earned in their 'home' departments because they were less skilled on the work in their new assignments than they were on the jobs in their 'home' departments.

"Conclusions of Law.

"2. That the employer, General Electric Company, X-Ray Department, has committed unfair labor practices within the meaning of section 111.06 (1) (f) of the Wisconsin statutes in the following respects:

"(a) That, although the employer violated no provision of the collective-bargaining agreements with respect to the physical transfers of LaVerne Ripinski and Audrey Czaplewski from department F to department XA for the period from March 4th, 1955, to April 4th, 1955, and with respect to the transfers of Howard Komm and Leo Bocziewicz from

department L to department F for the period from March 4th, 1955, to April 4th, 1955, the employer did violate the wage provisions of said agreements by not compensating said employees for incentive earnings lost as a result of their transfers during the afore-mentioned period."

"Order.

"It is ordered that the employer, General Electric Company, X-Ray Department, immediately

"1. Cease and desist from violating the provisions of the collective-bargaining agreement existing between the employer, General Electric Company, X-Ray Department, and the union, District No. 10 of the International Association of Machinists, A. F. L., dated October 27, 1952;

"(a) Relating to wage provisions, by failing to compensate employees for incentive earnings lost as a result of transfers to other departments at the request and convenience of the employer; . . .

"2. Take the following affirmative action, which the board finds will effectuate the policies of the act:

"(a) Make whole employees LaVerne Ripinski, Audrey, Czaplewski, Howard Komm, and Leo Bocziewicz for any incentive earnings they may have lost, during the period from March 4th, 1955, to April 4th, 1955, as a result of their transfers from department F and department L, respectively, by paying them at the rate of their average incentive earnings for the month previous to their respective transfers."

Relevant also to a consideration of the issues here presented is a portion of memorandum of the board which accompanied the findings of fact, conclusions of law, and order, and wherein it was said:

"We have today issued our findings of fact, conclusions of law, and order in the above-entitled matter, wherein we have found that certain acts committed by the employer resulted, in some instances, in violation of, and in other instances not in violation of, a collective-bargaining agreement existing between the employer and the union. After spend-

ing considerable time reviewing the lengthy record and briefs of counsel, the undersigned feel that this memorandum should accompany the findings of fact, conclusions of law, and order. We will not attempt to review the facts in this memorandum, for we believe they have been succinctly stated in the findings. . . .

"Transfer of Employees.

"We have concluded that the employer has not violated the seniority and transfer provisions of the collective-bargaining agreement by transferring the four employees from their respective departments. Nowhere in the agreement have we been able to find a provision limiting the right of the employer to transfer employees. As a matter of fact, the provisions contained in the wage supplement agreement contemplate transfers and apparently contemplate transfers which might be contrary to the will of the individual employees involved. However, we feel that where employees are transferred against their will from one job to another at the convenience and request of the employer, the employees so transferred should not suffer any pecuniary loss as a result of these transfers, and we concluded that the provisions in Article I of the wage supplement agreement includes not only employees' basic wage rate but also his incentive earnings. It should be noted that the record discloses that when the employees involved were transferred out of their departments originally because of a mistake in the seniority status of the parties concerned the employer transferred the two ladies involved back to their original department and the two men involved to another department, and that the ladies involved were compensated for their loss of earnings. . . ."

Two questions are presented by the appellant company for determination here. They are: "1. Did the Wisconsin Employment Relations Board act in excess of its powers when it made a finding and entered an order on a question which was not in issue and which was not litigated by the parties? 2. Is the finding that the employer violated the wage supplement of its collective-bargaining agreement contrary to the facts and the law?"

With respect to the first of these questions it is the position of the company that the union's complaint charged only that the company had transferred the four employees contrary to the seniority and transfer provisions of the labor contract. It submits that by the answer it had alleged that the transfers were in accordance with those provisions of the contract. It maintains that the specific issue raised by the complaint and answer involved only the matter of the physical transfers of the employees, and that said issue was completely determined when the board decided that the company did not violate the seniority and transfer provisions of the contract. It submits that the complaint in no manner charged an unfair labor practice with respect to violation of the wage supplement,—that such matter was not in issue,—and that neither party presented evidence at the hearing in relation to any such issue. It contends that by virtue of the finding and the order respecting violation of the wage supplement, such matter not being in issue nor litigated by the parties, the board acted in excess of its jurisdiction and in violation of the requirements of the Administrative Procedure Act (ch. 227, Stats.) and the Employment Peace Act (ch. 111, subch. I, Stats.).

It is the position of the respondent board (a) that the issue with respect to violation of the wage supplement was raised by the pleadings in that the complaint charged violation of the "transfer provisions" of the contract, and included by reference all circumstances shown in grievance D–5–2; (b) that the company's objection to lack of notice cannot be raised for the first time in this court; (c) that the board was not bound by the pleaders' interpretation of the contract; (d) that even if the question determined by the board was not within the scope of the complaint, the finding may not be challenged, since it is supported by evidence received without objection; (e) that since the board reached the correct result on the basis of the evidence, the order cannot be invalidated merely because of technical inexactitude of nomenclature,

*i.e.,* in failing to characterize those provisions of the wage supplement relating to transfers as "transfer provisions;" (f) that the decision in *Wonder-Rest Corp. v. Galina* (1957), 275 Wis. 273, 279, 81 N. W. (2d) 512, relied on by appellant, is not at variance with the board's in the instant case.

Paragraph 3 of the complaint in the proceeding before the board charged that the company had violated the "seniority and transfer provisions" of the agreement by transferring the employees from one department to another. It also charged that grievance D–5–2 further constituted a violation of the layoff and recall provisions of the agreement. The answer denied that the transfers complained of in grievance D–5–2 violated the seniority and transfer or the layoff and recall provisions of the agreement.

The complaint contained no direct allegation that there was a violation of the wage supplement or of the incentive bonus plan. The company did not defend with respect to any issue regarding such particulars. At the hearing it opposed only the union's claim of violation as to the physical transfer of the employees. It here maintains that its position in such respect was based on assumption that only such charge was to be litigated under paragraph 3 of the complaint. It contends that it was denied due process of law in that it had been given no notice of the charge of which it was found guilty by the board, and in that it had no opportunity to defend such charge. Counsel for the board argue that the charge of violation of "transfer provisions" of the agreement as averred in paragraph 3 of the complaint included matters relating to pay on temporary transfers, and that since there was reference to grievance D–5–2 in both the complaint and the answer, the documents employed in the several grievance procedural steps were incorporated in the pleadings by reference.

Counsel for the board directs attention to the fact that during the course of the grievance procedural steps there was

written communication between the union and the company as follows:

A notice from the union to the company dated March 11, 1955 (formal parts omitted):

"This grievance is the result of the company's compulsory action to transfer two people from department 'L' and also two persons from department 'F' against their will. The employees concerned are Howard Komm, Leo Bocziewicz from 'L,' and Audrey Czaplewski and LaVerne Ripinski from department 'F.'

"We believe that this is a violation of our agreement and doesn't conform with the practice of the company in the past. If job openings exist in the tube department, the openings should be filled with people who have been laid off.

"We feel the employees affected should be paid any loss in incentive earnings they may have suffered while working out of their respective departments, and further that they be returned to their departments immediately."

A letter from the company to the union dated March 23, 1955 (formal parts omitted):

"During our discussion of this case, we reached agreement that the reasons for the transfer of the two people from department L and from department F were thoroughly explained to the union prior to the transfer. To summarize, the transfers were necessary because of urgent production requirements in department XA.

"We explained that, in our opinion, we have a right to make such transfers under the provisions of our wage supplement, dated October 27, 1952. We further explained that in the normal course of operations, we do not like to make such transfers for obvious reasons, but on rare occasions it is necessary to do so.

"We told you at the time of the transfer it would be for approximately one month. We can now state that the employees will be returned to their regular jobs on April 4, 1955."

A notice from the union to the company dated March 25, 1955:

"Exception is herewith taken on grievance No. D–5–2.

"As you know, we disagree with management's interpretation and application (as was done in this department F and L case) of the wage supplement, dated October 27, 1952.

"It is the union's opinion, that all provisions in the agreement should be considered if applicable."

The board's counsel further submits that from the evidence it appears that the company was aware of the union's claim of payment for incentive bonus pay. With respect to such contention it refers to the testimony of John A. McGown, the company's manager of manufacturing, who was familiar with grievance D–5–2, relative to particulars as follows:

"*Q.* Now—appreciating that need, do you recall during the course of the procedure or in review of the grievance filed by the union, what the union's position was with respect to these matters? . . . *A.* I think the union had two feelings. They objected—I think they realized the need. I further remember that they had some question about the rates of pay of these people, and as I remember, they brought the question up. . . .

"Mr. Kline [attorney for company]: I'll stipulate the union had a position, and whatever the position was, Mr. McGown knew it. I would say he knew through hearsay evidence."

The company points to the fact that shortly after the hearing was commenced, the board's presiding officer, Mr. Slavney, inquired of the union's attorney as to the import of grievance D–5–2 in paragraph 3 of the complaint. The following colloquy took place:

"Mr. Slavney: May I interrupt? Are you in a position to advise the board as to what provision of the agreement you contend has been violated as a result of the facts stated in D–5–2? I think it would help the board. I wish with the other grievance, if the provision is different from in the instant grievance, you would bring it to the attention of the board.

"Mr. Gratz: With respect to grievance D–5–2, it is the union's position that these transfers constituted a violation of article V, on pages 5, 6, 7, 8 of the agreement. That's the seniority provision.

"Mr. Slavney: Okay."

It appears from the record that article V of the contract so referred to by the attorney for the union does not include wage provisions. Specifically the board in its memorandum declared: "We have concluded that the employer has not violated the seniority and transfer provisions of the collective-bargaining agreement."

It appears without dispute that the employees who worked in the transferred positions temporarily for a month did not earn incentive pay in such positions during said time, notwithstanding that it was possible for them to do so in accordance with the wage supplement and the incentive bonus plan. Their work, of course, was different in the transferred departments than it had been in the departments from which they were transferred. Incentive bonus pay, however, was provided for the work which they were called upon to perform in the departments to which they were transferred. The company now challenges that part of the board's finding and order compelling payment of incentive bonus pay at the rate of the employees' average incentive earnings for the month previous to their respective transfers, claiming that an issue relating to failure to pay incentive bonus was not properly noticed nor was such presented at the hearing.

The principle of fair play is an important factor in a consideration of due process of law. Parties in a legal proceeding have a right to be apprised of the issues involved, and to be heard on such issues. A finding or order made in a proceeding in which there has not been a "full hearing" is a denial of due process and is void. In *State ex rel. Madison Airport Co. v. Wrabetz* (1939), 231 Wis. 147, 153, 155, 285 N. W. 504, it was said:

"As has been said in a number of cases, the cardinal and ultimate test of the presence or absence of due process of law in any administrative proceeding is the presence or absence of the 'rudiments of fair play long known to our law.' *West Ohio Gas Co. v. Public Utilities Comm.* (No. 1) 294 U. S. 63, 71, 55 Sup. Ct. 316, 79 L. Ed. 761; *Chicago, M. & St. P. R. Co. v. Polt,* 232 U. S. 165, 168, 34 Sup. Ct. 301, 58 L. Ed. 554; *Ohio Bell Tel. Co. v. Public Utilities Comm.* 301 U. S. 292, 300, 57 Sup. Ct. 724, 81 L. Ed. 1093; *Morgan v. United States,* 304 U. S. 1, 15, 58 Sup. Ct. 773, 82 L. Ed. 1129; *Morgan v. United States,* 298 U. S. 468, 480, 56 Sup. Ct. 906, 80 L. Ed. 1288."

"An order or award made in a proceeding conducted in disregard of the procedural safeguards prescribed by the statute authorizing the exercise of authority by the commission, or in disregard of the rudiments of fair play required by the federal and state constitutions, is certainly without and in excess of the commission's powers; . . ."

In *Folding Furniture Works v. Wisconsin L. R. Board* (1939), 232 Wis. 170, 191, 285 N. W. 851, it was said:

"A judgment or order entered by an administrative board in a quasi-judicial proceeding wherein the board has denied a party to it due process is void and the aggrieved party is entitled to an appropriate proceeding (if he has been prejudiced by the denial) to have the judgment or order set aside. Due process requires as much as 'full hearing,' the requirements of which have been recently passed upon by the supreme court of the United States in the *Morgan Cases, Morgan v. United States,* 298 U. S. 468, 56 Sup. Ct. 906, 80 L. Ed. 1288; 304 U. S. 1, 58 Sup. Ct. 773, 82 L. Ed. 1129, and in *Consolidated Edison Co. v. National Labor Relations Board, supra* [305 U. S. 197, 235, 236, 59 Sup. Ct. 206, 83 L. Ed. 126]."

Sec. 227.09, Stats., provides that: "Every party to a contested case [before a board] shall be given a clear and concise statement of the issues involved." Sec. 111.07 (2) (a) refers to filing with the board of a complaint in writing charging any person with having engaged in "any specific

unfair labor practice." Sec. 111.07 (4) provides that the board shall "make and file its findings of fact upon all of the issues involved in the controversy." An issue of fact arises when a fact is maintained by one party and is controverted by the other in the pleadings.

In *Lancaster Yellow Cab & Baggage v. Pennsylvania L. R. Board* (1952), 371 Pa. 49, 88 Atl. (2d) 866, it was held that an employer charged with an unfair labor practice is entitled to know the specific unfair practice with which he is charged, and that when charged with a specific unfair labor practice the employer may not be ordered to take a remedial action appropriate only to a different unfair labor practice.

The National Labor Relations Board has reversed findings of unfair labor practices made by trial examiners in situations where the complaints did not charge the particular unfair labor practices found. *Starrett Brothers and Eken, Inc.* (1951), 92 NLRB 1757; *Augusta Bedding Co. and Denney* (1951), 93 NLRB 211; and *J. I. Case Co. and Local 180, I. U. U. A. A. A. I. W.* (1946), 71 NLRB 1145.

A board is not entitled to make a finding with respect to a situation that is not in issue. The complaint may be amended and hearing granted on the new issue. *Consolidated Edison Co. v. National L. R. Board* (1938), 305 U. S. 197, 235, 236, 59 Sup. Ct. 206, 83 L. Ed. 126. Sec. 111.07 (2) (a), Wis. Stats., provides for amendment of the complaint in unfair-labor-practice proceedings at any time before the issuance of the final order.

Paragraph 3 of the complaint does not expressly state that an unfair labor practice was claimed because the transferred employees were improperly paid the rate contemplated in the wage schedule or under the incentive bonus arrangement of the agreement. Persuasive indeed might be the board's contention here that all matters covered by grievance D–5–2 were within the contemplation of the parties at the hearing,

and that the board was justified in determining all issues thereunder, were it not for the fact that at the very beginning of the hearing, when obviously it was not plain to the board which of the precise features of grievance D–5–2 were to be litigated, the attorney for the union in response to a question put to him by the presiding officer of the board with reference thereto, stated that consideration of grievance D–5–2 was to be limited to seniority provisions of the contract. Such provisions covered only matters pertaining to permanent transfer of employees, and not considerations relating to temporary transfers. The company defended on the ground that the transfers were not permanent and that seniority provisions did not apply. The board made a finding favorable to the employer in such regard. Counsel for the board have countered that the company must have known at the hearing that the matter of claim for incentive bonus pay in relation to temporary transfers was in issue, because the employees at that time had already been retransferred to their own departments. This contention does not strike us as being forcible in view of the position stated by the attorney for the union that only matters relating to seniority were to be litigated in connection with grievance D–5–2. Clearly the grievance notice of March 11, 1955, given by the union to the company charged that the employees had been improperly transferred (a fact not found by the board to have existed). Payment for loss of incentive bonus (as had apparently been made on the previous occasion when employees had been improperly transferred by mistake) was demanded therein because of the improper transfer. The written exception of March 25, 1955, given by the union to the company in the course of the grievance procedure referred to the fact that "all provisions in the agreement should be considered if applicable." It is the contention of the company that it assumed that the union was willing to forego such consideration in view of the position expressly stated by its attorney at the

hearing that only seniority provisions were contemplated with reference to grievance D–5–2. True, in its communication of March 23, 1955, to the union, the company referred to the wage supplement. However, it appears to be plain that its reference as to the wage supplement did not refer to any recognition of claim by the union for incentive bonus pay when employees were properly transferred.

Examination of the entire record reveals that the evidence presented by the parties at the hearing related primarily to the physical transfer of the employees. There was incidental evidence presented by the union to the effect that the employees were dissatisfied because they were unfamiliar with the work in the department to which they were transferred, and that they did not like the work there, and further that they were concerned about their loss of incentive bonus pay. The company's manager of manufacture *inter alia* testified as to his understanding of the union's position with respect to the filing of the grievance. He said: "I think the union had two feelings, . . . I think they realized the need. I further remember that they had some question about the rates of pay of these people." No evidence was adduced by the company with reference to wages or incentive pay. The board found that there was ambiguity in the contract with reference to matters of temporary transfer and payment of incentive bonus. It decided the matter upon principles applicable when ambiguity exists. Matters which the company probably could have presented, had it been aware that an issue with respect to incentive pay existed, were not offered. It is manifest that the company was not cognizant that the union considered the matter of incentive bonus pay as an issue under the pleadings, nor that the board would treat that matter as an issue for its determination. While it is recognized that pleadings are to be treated as flexible, and that they are to be liberally construed in administrative proceedings, nevertheless in view of the fact that there was no

direct reference in the pleadings to any claim for incentive bonus pay, and particularly by reason of the fact that the company could well have been justified in believing that such matter was not in issue in view of the position of the union as stated by its counsel that matters relating to grievance D–5–2 were to be considered only from the standpoint of the seniority provisions, we are impelled to conclude that in the interest of justice the cause must be remanded to the board where opportunity is to be granted for a full hearing with respect to the issue.

The company's petition for review of the board's findings, conclusions, and order, as addressed to the court below, charged that the board's findings were "arbitrary and capricious" and were "unsupported by the evidence." We are of the opinion that findings entered without notice of hearing may reasonably be deemed "arbitrary and capricious." While the merits of the incentive bonus-pay issue were argued and determined below, it does not appear that argument was made with respect to the failure of notice and full hearing, notwithstanding that such issue was raised by the charge that the findings were "arbitrary and capricious." In arriving at the conclusion above expressed we are not unmindful that this court at times has ruled that it will not consider an issue which was not raised or passed on by the court below. *Callaway v. Evanson* (1956), 272 Wis. 251, 75 N. W. (2d) 456. However, there are exceptions to such rule. In *Herro v. Heating & Plumbing F. Corp.* (1931), 206 Wis. 256, 263, 239 N. W. 413, it was said:

"It is well settled that this court generally refuses to consider and dispose of questions on appeal which have not properly or in a timely manner been presented for determination by the trial court. There are, however, exceptions to such rule. *Cappon v. O'Day,* 165 Wis. 486, 162 N. W. 655; *Braasch v. Bonde,* 191 Wis. 414, 211 N. W. 281. These exceptions to the general rule, however, involve questions of

law which, though not raised below, may nevertheless be raised and decided by this court on appeal."

See also *Culligan, Inc., v. Rheaume* (1954), 268 Wis. 298, 310, 67 N. W. (2d) 279; *Wauwatosa v. Milwaukee* (1951), 259 Wis. 56, 59, 47 N. W. (2d) 442; and *Marshall & Ilsley Bank v. Stepke* (1938), 228 Wis. 39, 43, 279 N. W. 625.

The situation in the matter at bar is not unlike in principle that which existed in *Cappon v. O'Day* (1917), 165 Wis. 486, 490, 162 N. W. 655, wherein it was said:

"This court sits here to do justice between litigants. For the purpose of orderly administration and the attainment of justice certain rules are established. Any rule the enforcement of which results in a failure of justice should be carefully scrutinized and not blindly adhered to, unless the abandonment of it will work more injustice than will follow if it be adhered to."

Here, too, the appellant complains that its constitutional right to due process of law was violated. Constitutional rights may be waived. However, on the record presented we are not satisfied that such right was waived.

In view of the conclusions herein reached, we consider that it is unnecessary to determine the other matters raised on this appeal.

*By the Court.*—The judgments are reversed, with directions to remand the proceeding to the Wisconsin Employment Relations Board for a full hearing with respect to claim by District No. 10 of the International Association of Machinists, A. F. L. that General Electric Company, X-Ray Department, was guilty of an unfair labor practice by virtue of its failure to have paid incentive bonus to the four employees temporarily transferred on March 4, 1955, in violation of the collective-bargaining agreement.

FAIRCHILD, J. (*dissenting*). One of the attributes of administrative tribunals which has often been thought to be

an advantage is relative informality of procedure. It is true that there were no pleadings before the board in this case which raised the issue of the meaning of the word "rate" with the formality that would be required in a court action. It is clear from the testimony, however, that the union's position that an employee's rate of pay, including incentive earnings, should be protected in the event of a temporary transfer had at least been discussed between the parties. Furthermore, the appellant itself was relying upon the provision of the contract which required it to protect the employees' "rate" as proof of its authority to make temporary transfers without regard to seniority. In the circuit court the appellant did not assert in its petition that the board had acted upon an issue which was not properly before it and it appears from the very careful opinion of the circuit court that no such proposition was argued in the circuit court. If the board's determination of the meaning of the word "rate" were in fact a violation of the fundamental rules of fair play and requirements of due process, it can be safely assumed that the appellant would have raised that issue strongly before the circuit court and in my opinion, it, not having done so, should be foreclosed from doing so in the supreme court.

The circuit court concluded that there was ambiguity in the use of the unmodified word "rate" in the transfer clause and that the evidence before the board supported its finding as to the sense in which the parties intended to use it. I would affirm the judgments.