HORTONVILLE EDUCATION ASSOCIATION and others, Appellants,* v. HORTONVILLE JOINT SCHOOL DISTRICT No 1 and others, Respondents.*

*No. 635.   Argued November 26, 1974.—Decided February 5, 1975.*
(Also reported in 225 N. W. 2d 658.)

* Motions for rehearing denied, without costs, on March 28, 1975.

470

472

476

For the appellants there were briefs by *Robert H. Friebert* and *Thomas W. St. John,* attorneys, and *Samson, Friebert, Finerty & Burns,* of counsel, all of Milwaukee, and oral argument by *Robert H. Friebert.*

For the respondents there was a brief by *Jack D. Walker, James K. Ruhly* and *Melli, Shiels, Walker &*

*Pease, S. C.,* all of Madison, and oral argument by *Jack D. Walker.*

A separate brief amicus curiae was filed by each of the following: (a) *James F. Clark, Karen A. Mercer* and *Ela, Esch, Hart & Clark,* all of Madison, for The Wisconsin Association of School Boards, Inc.; (b) *Jean J. Setterholm* of Madison for the League of Wisconsin Municipalities; (c) *John C. Carlson* and *Lawton & Cates,* all of Madison, for the Wisconsin Coalition of American Public Employees; and (d) *Zubrensky, Padden, Graf & Bratt* of Milwaukee for The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

For the appellants there were briefs by *Robert H. Friebert* and *Thomas W. St. John,* attorneys, and *Samson, Friebert, Finerty & Burns* of counsel, all of Milwaukee.

For the respondents there were briefs by *Jack D. Walker, James K. Ruhly* and *Melli, Shiels, Walker & Pease, S. C.,* all of Madison.

There was a brief amicus curiae filed for the Wisconsin Association of School Boards, Inc., by *James F. Clark, Karen A. Mercer* and *Ela, Esch, Hart & Clark,* all of Madison.

BEILFUSS, J.   The issues in this court are:

1.   Does Wisconsin law allow the discharge of municipal employees who engage in a strike?

2.   Does the action by the Hortonville school board in discharging teachers instead of obtaining a judicial order constitute selective enforcement of the Wisconsin prohibition of the right to strike, thereby denying to the teachers their right to equal protection of the laws?

3.   Does the state's prohibition against strikes by teachers, without provision for binding arbitration and de novo review of reasonableness of punishment, when

such benefits are provided for other public employees, constitute a violation of the equal protection clause of the fourteenth amendment to the United States Constitution?

4. Were the strikers denied due process of law because they were discharged by the Hortonville school board which is not a neutral, impartial and detached decision maker?

5. Did the action taken by the Hortonville board of education constitute a violation of the open meeting law?

The general rule is that issues not presented to the trial court will not be considered for the first time on appeal. *Estate of Scherffius* (1974), 62 Wis. 2d 687, 696, 697, 215 N. W. 2d 547; *Resseguie v. American Mut. Liability Ins. Co.* (1971), 51 Wis. 2d 92, 103, 104, 186 N. W. 2d 236. With respect to constitutional issues, this court had said it may, in its discretion, consider such issues for the first time on appeal if it is in the interest of justice to do so and there are no unresolved factual issues. *State v. Morales* (1971), 51 Wis. 2d 650, 654, 187 N. W. 2d 841; *Bradley v. State* (1967), 36 Wis. 2d 345, 359, 359a, 153 N. W. 2d 38, 155 N. W. 2d 564. We believe, in this case, it is in the interest of justice to consider the issues raised as set forth above.

Does Wisconsin law allow the discharge of municipal employees who engage in a strike?

As to all municipal employees, sec. 111.70 (4) (l), Stats., provides:

*"Strikes prohibited.* Nothing contained in this subchapter shall constitute a grant of the right to strike by any county or municipal employe and such strikes are hereby expressly prohibited."

As to state employees, sec. 111.89, Stats., provides:

**"Strike prohibited.** (1) Upon establishing that a strike is in progress, the employer may at his option either seek an injunction or file an unfair labor practice charge

with the commission under s. 111.84 (2) (e) or both. In this regard it shall be the responsibility of the department of administration to decide whether to seek an injunction or file an unfair labor practice charge. The existence of an administrative remedy shall not constitute grounds for denial of injunctive relief.

"(2) The occurrence of a strike and the participation therein by a state employe do not affect the rights given to the employer to deal with the strike, including:

"(a) The right to impose discipline, including discharge, or suspension without pay, of any employe participating therein;

"(b) The right to cancel the reinstatement eligibility of any employe engaging therein; and

"(c) The right of the employer to request the imposition of fines, either against the labor organization or the employe engaging therein, or to sue for damages because of such strike activity."

The appellants contend that since employers of state employees are specifically given the right to discharge in the event of a strike, while no similar provision applies to municipal employees, that municipal employers are not allowed to discharge striking employees but are restricted to the remedy of injunction.

The respondents cite *Millar v. Joint School Dist.* (1957), 2 Wis. 2d 303, 312, 86 N. W. 2d 455, for the proposition that:

"A school board has implied power to dismiss a teacher before the expiration of his term of service for good and sufficient cause. . . . If a teacher fails to perform his duties under his contract, the board may discharge him from further service."

They further contend that sec. 111.70 (4) (1), Stats., in no way diminishes that right. We believe they are correct in that contention. Sec. 118.22 (2) provides:

"On or before March 15 of the school year during which a teacher holds a contract, the board by which the teacher is employed or an employe at the direction of the board shall give the teacher written notice of renewal or refusal to renew his contract for the ensuing school year. If no

such notice is given on or before March 15, the contract then in force shall continue for the ensuing school year. A teacher who receives a notice of renewal of contract for the ensuing school year, or a teacher who does not receive a notice of renewal or refusal to renew his contract for the ensuing school year on or before March 15, shall accept or reject in writing such contract not later than the following April 15. No teacher may be employed or dismissed except by a majority vote of the full membership of the board. Nothing in this section prevents the modification or termination of a contract by mutual agreement of the teacher and the board. No such board may enter into a contract of employment with a teacher for any period of time as to which the teacher is then under a contract of employment with another board."

The reference to the fact that a teacher may be "dismissed" clearly indicates the existence of the right to discharge. Both *Millar, supra,* and *Richards v. Board of Education* (1973), 58 Wis. 2d 444, 460b, 206 N. W. 2d 597, indicate clearly that the term "dismiss" means to remove from employment and not to merely refuse to renew a contract.

Furthermore, the power of the board to discharge a teacher for "just cause" is clearly preserved in the master contract [3] between HEA and the school district.

From the statutes, the cases cited, and the contract, we conclude the school board did have the power to discharge the teachers who engaged in the prohibited strike.

The appellants contend the action by the Hortonville school board in discharging the teachers instead of obtaining a judicial order constitutes selective enforcement of the Wisconsin prohibition of the right to strike, thereby denying to the teachers their right to equal protection of the laws as guaranteed by the state and federal constitutions.

---

[3] The master agreement, while contained in the record at pages 214–225, was not part of or appended to either of the affidavits filed with respect to the motion for summary judgment. However, because we have decided to determine the issues raised upon appeal, this document should be considered.

The appellants argue that this is the first known instance in Wisconsin where striking teachers have been discharged. They assert that the usual procedure is for the school board to seek an injunction, and that the deviation from this practice in this case amounts to selective enforcement of the law and a denial of equal protection.

The respondents, in argument, deny this is the first instance of discharge because of strike activity. They also urge that there is an unresolved factual dispute involved, *i.e.*, what is the normal procedure in the case of teacher strikes? For the purpose of this opinion, we will assume the factual allegation of the appellants is correct.

Several factors bear on the question of whether the discharge amounted to a denial of equal protection due to selective enforcement of the law. The basic question that must be answered in the affirmative before a denial of equal protection can be found is whether a difference in treatment amounts to invidious discrimination. *Harper v. Virginia Board of Elections* (1966), 383 U. S. 663, 666, 86 Sup. Ct. 1079, 16 L. Ed. 2d 169.

Arguably at least, there were other remedies the school board could have pursued. It could have sought an injunction, it could have sought fact finding and mediation before the Wisconsin Employment Relations Commission,[4] it could have continued collective bargaining or it could have discharged the teachers for violating the statutory prohibition against public employee strikes as was done here. The fact the school board pursued one of the remedies does not ipso facto mean the teachers were denied equal protection. This is especially true in this case because we do not have a record which reveals all the pertinent and relevant facts upon which the board acted. What might be a fair and reasonable response on the part of the board might not be under a different factual background. Further, the right to discharge here

[4] Sec. 111.70, Stats.

is essentially contractual. Whether the master contract between the board and the school district and the contracts between the individual school teachers and the districts are comparable cannot be determined from the record in this case.

With one exception not material here, all of the striking teachers were treated the same. They were all given the same notices, all had the same opportunity to be heard, all were discharged and all given the right to apply for reinstatement. The record does not reveal invidious discrimination and no denial of equal protection appears.

The appellants also contend that they were denied equal protection of the law in two additional respects: First, in that they are denied the right to strike, contrary to their counterpart in the private sector; and, second, in that they are denied certain benefits, *e.g.,* binding arbitration, which are accorded to other public employees, *i.e.,* police and firemen.

Absent a suspect classification or a fundamental right, neither of which are involved in this case,[5] this court has held that:

". . . to declare an act of the legislature as to a classification violative of the equal-protection clause, it is first necessary to prove that the legislature has abused its discretion beyond a reasonable doubt." *State ex rel. La Follette v. Reuter* (1967), 36 Wis. 2d 96, 111, 153 N. W. 2d 49. *See also: Wiener v. J. C. Penney Co.* (1974), 65 Wis. 2d 139, 147, 222 N. W. 2d 149.

There is a strong presumption of constitutionality which attaches to acts of the legislature, unless the court can say that no statement of facts can reasonably be conceived that would sustain it. *Wiener, supra,* page 147; *State ex rel. Hammermill Paper Co. v. La Plante* (1973), 58 Wis. 2d 32, 46, 205 N. W. 2d 784. Only if a classification is

[5] *See: Warshafsky v. The Journal Co.* (1974), 63 Wis. 2d 130, 216 N. W. 2d 197; *United Federation of Postal Clerks v. Blount* (D. C. D. C. 1971), 325 Fed. Supp. 879, affirmed (1971), 404 U. S. 802, 92 Sup. Ct. 80, 30 L. Ed. 2d 38.

arbitrary and has no reasonable purpose or reflects no justifiable public policy will it be held violative of constitutional guarantees of equal protection. *Simanco, Inc. v. Department of Revenue* (1973), 57 Wis. 2d 47, 57, 203 N. W. 2d 648. In *Wiener, supra,* page 147, this court reiterated five standards necessary for a proper classification:

"(1) All classifications must be based upon substantial distinctions which make one class really different from another.

"(2) The classifications adopted must be germane to the purpose of the law.

"(3) The classifications must not be based upon existing circumstances only. They must not be so constituted as to preclude additions to the numbers included within a class.

"(4) To whatever class a law may apply, it must apply equally to each member thereof.

"(5) The characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation." *See also: Dane County v. McManus* (1972), 55 Wis. 2d 413, 423, 198 N. W. 2d 667; *State ex rel. Ford Hopkins Co. v. Mayor* (1937), 226 Wis. 215, 222, 276 N. W. 311.

Considering appellants' contentions in reverse order, they claim that teachers are denied equal protection because, unlike police and firemen, they are not accorded binding arbitration [6] or other dispute settlement rights. The different treatment accorded police and firemen is "based upon substantial distinctions which make one class really different from another." *Weiner, supra,* page 147. It is not difficult to find a rational basis for the legislation. If police or firemen go on strike the imminent and immediate danger to the community is so great that every reasonable measure must be taken to get them back

---

[6] *See:* Secs. 111.70 (4) (jm) and 111.77, Stats.

on the job as soon as possible, or to prevent them from striking in the first instance. The classification is not unreasonable and is a legitimate exercise of the legislative function.

A more difficult question arises with respect to the appellants' contention that they are denied equal protection, vis-a-vis nonpublic employees, by the application of the strike ban contained in sec. 111.70 (4) (1), Stats.

Several rationales are typically propounded in support of no-strike laws for public employees. One relies on the sovereignty of the governmental employee and reasons that the government, unlike the private employer, cannot suspend operations nor go out of business nor increase its budgets, and therefore is entitled to expect a higher level of devotion to service. *Norwalk Teachers' Asso. v. Board of Education* (1951), 138 Conn. 269, 83 Atl. 2d 482. Another rationale is that the peculiar nature of the government, as opposed to private employers, makes it particularly vulnerable to the strike.

". . . In the private sector, union demands are usually checked by the forces of competition and other market pressures. Negotiators are typically limited by such restraints as the entry of non union competitors, the impact of foreign goods, the substitution of capital for higher-priced labor, the shift of operations to lower-cost areas, the contracting out of high-cost operations to other enterprises, the shutdown of unprofitable plants and operations, the redesign of products to meet higher costs, and finally the managerial option to go out of business entirely. Similar limitations are either nonexistent or very much weaker in the public sector. While budgets and corresponding tax levies operate in a general way to check increases in compensation, the connection is remote and scarcely applicable to particular units of groups of strategically located public employees. Unhampered by such market restraints, a union that can exert heavy pressure through a strike may be able to obtain excessive wages and benefits." Cox and Bok, *Labor Law* (7th ed.), pages 970, 971.

An additional rationale is that public employees have adequate opportunity to achieve their aims through the legislative process. *Note: The Strike and Its Alternatives in Public Employment,* 1966 Wisconsin Law Review, 549, 556. It is also often stated that the strike ban protects the public health, safety and welfare.

The position of the appellants is that neither these nor any other rationales can support the validity of the strike ban, at least with respect to them. They concede, of course, that a strike by police or firemen may result in real, immediate and irreparable harm to the community, and thus admit that the strike ban is valid as applied to those types of emergency services. They argue, however, that the statute is too broad in its scope.

Many courts have considered this issue and none have found a denial of equal protection. *See:* Annot. (1971), *Labor Law: Right of Public Employees to Strike or Engage in Work Stoppage,* 37 A. L. R. 3d 1147. As stated in *United Federation of Postal Clerks v. Blount, supra,* page 883:

"Given the fact that there is no constitutional right to strike, it is not irrational or arbitrary for the Government to condition employment on a promise not to withhold labor collectively, and to prohibit strikes by those in public employment, whether because of the prerogatives of the sovereign, some sense of higher obligation associated with public service, to assure the continuing functioning of the Government without interruption, to protect public health and safety or for other reasons. Although plaintiff argues that the provisions in question are unconstitutionally broad in covering all Government employees regardless of the type or importance of the work they do, we hold that it makes no difference whether the jobs performed by certain public employees are regarded as 'essential' or 'non-essential,' or whether similar jobs are performed by workers in private industry who do have the right to strike protected by statute. . . . The Equal Protection Clause, however, does not forbid

all discrimination. Where fundamental rights are not involved, a particular classification does not violate the Equal Protection Clause if it is not 'arbitrary' or 'irrational,' i.e., 'if any state of facts reasonably may be conceived to justify it.' McGowan v. Maryland, 366 U. S. 420, 426, 81 S. Ct. 1101, 1105, 6 L. Ed. 2d 393 (1961). . . ."

We conclude there is a meaningful distinction between governmental employees and nongovernmental employees. The strike ban imposed on public employees is based upon a valid classification and the legislation creating it is not unconstitutional as a denial of equal protection. If the no-strike ban legislatively imposed on public employees is to be abolished or altered, it must be done by the legislature and not the courts.

The teachers contend they were denied due process of law because the hearings were not considered and their discharges ordered by an impartial decision maker.

The fourteenth amendment to the United States Constitution provides, *inter alia,* that no state shall deprive any persons of property or liberty without due process of law. Before it can be determined whether the appellants were denied due process, it must be established that they were entitled to due process of law in that they were deprived of their property or liberty by state action.

State action is clearly present in this case. The Hortonville Joint School District No. 1 is organized under the laws of the state of Wisconsin and is a municipal employer as defined in sec. 111.70, Stats. The school board is charged under chs. 118 and 120 with the management of the school district. The district, the board and their agents are therefore extensions of the state.

With respect to the question of deprivation of property, we refer to *Board of Regents v. Roth* (1972), 408 U. S. 564, 92 Sup. Ct. 2701, 33 L. Ed. 2d 548, and *Perry v. Sindermann* (1972), 408 U. S. 593, 92 Sup. Ct. 2694, 33

L. Ed. 2d 570. In *Roth,* the court decided that a non-tenured assistant professor was not entitled to procedural due process when his one-year teaching contract was not renewed. The court stated:

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms.

". . .

". . . To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely on their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. . . ." *Roth, supra,* pages 576, 577.

In *Perry,* the court added:

"A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown. Yet absence of such an explicit contractual provision may not always foreclose the possibility that a teacher has a 'property' interest in re-employment. For example, the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.' 3 A. Corbin on Contracts, secs. 561–572A (1960). Explicit contractual provisions may be supplemented by other agreements im-

plied from 'the promisor's words and conduct in the light of the surrounding circumstances.' *Id.*, at sec. 562. And, '[t]he meaning of [the promisor's] words and acts is found by relating them to the usage of the past.' *Ibid.*" *Perry, supra,* pages 601, 602. *See also: Pelisek v. Trevor State Graded School Dist. No. 7* (E. D. Wis. 1974), 371 Fed. Supp. 1064.

In *Wieman v. Updegraff* (1952), 344 U. S. 183, 73 Sup. Ct. 215, 97 L. Ed. 216, the court held that professors removed from office during the terms of their contracts were entitled to due process. *See also: Carpenter v. City of Greenfield School District No. 6* (E. D. Wis. 1973), 358 Fed. Supp. 220.

In this case the appellant-teachers were discharged during the terms of their 1973-1974 contracts and their offers or contracts for employment for the 1974-1975 school year were revoked or rescinded. This unquestionably amounted to a deprivation of property within the intendment of the due process clause.

The respondents contend that no deprivation of property is involved because the employees, by going on strike, abandoned whatever property interest they had in continued employment. Going on strike, the respondents argue, is the equivalent of quitting, a unilateral breach of the employment contract which dissolves any property interests for due process purposes.

It is unnecessary to reach the merits of this contention, however, because the argument begs the question. One of the purposes of due process in this context is to determine whether the alleged conduct did in fact take place. To say that the performance of certain acts forecloses the requirement of a hearing to determine whether the acts were in fact performed is to engage in circular reasoning. The teachers were deprived of a constitutional property right in this case.

Another question to be considered is whether the teachers were deprived of liberty. The United States Supreme Court in *Roth, supra,* pages 573, 574, stated:

"There might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated. But this is not such a case.

"The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' *Wisconsin v. Constantineau,* 400 U. S. 433, 437. *Wieman v. Updegraff,* 344 U. S. 183, 191. . . In such a case, due process would accord an opportunity to refute the charge before University officials. In the present case, however, there is no suggestion whatever that the respondent's 'good name, reputation, honor, or integrity' is at stake.

"Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case. For '[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury. . . .' *Joint Anti-Fascist Refugee Committee v. McGrath* [341 U. S. 123] . . . at 185 (JACKSON, J., concurring). . . ."

In *Roth,* there was no stated reason for the nontenured teacher not being rehired. In the case at bar, however, the stated reasons were two: (1) The teachers had breached their contracts, and (2) they had engaged in a strike contrary to Wisconsin law. It is apparent that such charges could detrimentally affect an individual's reputa-

tion in the labor market and thereby significantly undermine his opportunities for re-employment. Due process requires a notice and hearing and an opportunity for the teachers to clear themselves of such charges.

Having determined that the teachers were entitled to due process, the more difficult question of what process is due emerges. The often-quoted *Cafeteria Workers v. McElroy* (1961), 367 U. S. 886, 895, 81 Sup. Ct. 1743, 6 L. Ed. 2d 1230, provides:

". . . consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."

Thus a balancing test must be established to weigh the interest of the school district in summary determination against the interests of the teachers in their continued employment. Only in light of that balancing test can it be determined whether the procedures afforded the teachers failed to satisfy the constitutional requirements of due process.

With respect to those procedures, the appellants allege their constitutional inadequacy in only one respect, *i.e.*, the lack of an impartial decision maker.[7] The require-

---

[7] The appellants do make brief reference to the alleged lack of timely notice, the failure of the board to present evidence against them, and the preclusion of the teachers from questioning members of the board or offering affirmative evidence. They do not argue these points, however, and the only issue raised regarding due process goes to the alleged lack of an impartial decision maker.

With respect to the lack of timely notice, it should be noted that although the longest notice received was four days, spanning a weekend, and the shortest was received on the day of the hearing, counsel for the teachers was asked at the hearing how much additional time he needed to prepare. Counsel replied that he would make an offer of proof and then let the board know if

ment of an impartial decision maker is well established as an essential component of procedural due process. *See: Gibson v. Berryhill* (1973), 411 U. S. 564, 578, 93 Sup. Ct. 1689, 36 L. Ed. 2d 488; *Ward v. Village of Monroeville* (1972), 409 U. S. 57, 60, 93 Sup. Ct. 80, 34 L. Ed. 2d 267; *Morrissey v. Brewer* (1972), 408 U. S. 471, 485, 92 Sup. Ct. 2593, 33 L. Ed. 2d 484; *Goldberg v. Kelly* (1970), 397 U. S. 254, 271, 90 Sup. Ct. 1011, 25 L. Ed. 2d 287. In *Morrissey,* involving the due process required to be afforded a parolee prior to revocation, the court stated:

"In our view, due process requires that after the arrest, the determination that reasonable ground exists for revocation of parole should be made by someone not directly involved in the case. It would be unfair to assume that the supervising parole officer does not conduct an interview with the parolee to confront him with the reasons for revocation before he recommends an arrest. It would also be unfair to assume that the parole officer bears hostility against the parolee that destroys his neutrality; realistically the failure of the parolee is in a sense a failure for his supervising officer. However, we need make no assumptions one way or the other to conclude that there should be an uninvolved person to make this preliminary evaluation of the basis for believing the conditions of parole have been violated. The officer directly involved in making recommendations cannot always have complete objectivity in evaluating them. *Goldberg v. Kelly* found it unnecessary to impugn the motives of the caseworker to find a need for an independent decisionmaker to examine the initial decision." *Morrissey, supra,* pages 485, 486.

In *Ward, supra,* a case involving a situation where a city mayor was empowered to sit as judge to try ordinance violation cases, the fines from which constituted a significant part of the city's income, the court stated that the test was whether:

---

he needed more time. The offer was made but counsel never requested additional time thereafter.

". . . [the] situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused. . . .' " *Ward, supra,* page 60.

It is important to note that procedural due process is not limited to the factual determination as to whether an individual did or did not engage in the particular conduct. It extends as well to the action taken by the state once that conduct is established. As stated in *Morrissey, supra,* page 488:

"This [due process] hearing must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation. The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that violation does not warrant revocation."

Therefore it would seem essential, even in cases of undisputed or stipulated facts, that an impartial decision maker be charged with the responsibility of determining what action shall be taken on the basis of those facts. "The principle of fair play is an important factor in a consideration of due process of law." *General Electric Co. v. Wisconsin Employment Relations Board* (1958), 3 Wis. 2d 227, 241, 88 N. W. 2d 691; *Durkin v. Board of Police & Fire Comm.* (1970), 48 Wis. 2d 112, 122, 180 N. W. 2d 1.

The background giving rise to the ultimate facts in this case reveals a situation not at all conducive to detachment and impartiality on the part of the school board. The board was the collective bargaining agent for the school district and thus was engaged in the collective

bargaining process with the teachers' representative, the HEA. It is not difficult to imagine the frustration on the part of the board members when negotiations broke down, agreement could not be reached and the employees resorted to concerted activity. This is not to suggest, of course, that the board members were anything but dedicated public servants, trying to provide the district with quality education while still keeping within its limited budget. They were, however, not uninvolved in the events which precipitated decisions they were required to make. The decision to discharge was possibly a convenient alternative which would eliminate their labor problems in one fell swoop. We conclude that the board was not an impartial decision maker in a constitutional sense and that the appellants were denied due process of law.

Respondents rely heavily on two cases, *Arnett v. Kennedy* (1974), 416 U. S. 134, 94 Sup. Ct. 1633, 40 L. Ed. 2d 15, and *Johnson v. Board of Regents* (W. D. Wis. 1974), 377 Fed. Supp. 227, to support their contention that there is no due process violation involved in this case. In *Arnett*, a federal employee was discharged by his immediate superior because the employee allegedly made disparaging remarks about such superior. The court held that whatever expectancy of continued employment, and hence property right, the employee had in his job was created by the Lloyd-La Follette Act (Act of Aug. 24, 1912, ch. 389, sec. 6, 37 Stat. 555, now 5 U. S. C., sec. 7501), which provides in pertinent part at page 150:

" '[N]o person in the classified civil service of the United States shall be removed therefrom except for such cause as will promote the efficiency of said service and for reasons given in writing, and the person whose removal is sought shall have notice of the same and of any charges preferred against him, and be furnished with a copy thereof, and also be allowed a reasonable time for personally answering the same in writing; and

affidavits in support thereof; but no examination of witnesses nor any trial or hearing shall be required except in the discretion of the officer making the removal; . . .' "

The three justices who constituted the plurality in *Arnett* stated with respect to due process:

". . . the very section of the statute which granted him that right, a right which had previously existed only by virtue of administrative regulation, expressly provided also for the procedure by which 'cause' was to be determined, and expressly omitted the procedural guarantees which appellee insists are mandated by the Constitution. Only by bifurcating the very sentence of the Act of Congress which conferred upon appellee the right not to be removed save for cause could it be said that he had an expectancy of that substantive right without the procedural limitations which Congress attached to it. . . ." *Arnett, supra,* page 152.

The plurality thus concluded that extent of the property right was limited by the act itself, and hence due process was not required. There is no analogous situation here.

In *Johnson,* the chancellors of the various campuses in the state university system were faced with budget cuts, and thus had to determine how to effectuate them. The plaintiff-professor was discharged by his chancellor as a result of such situation. With respect to the plaintiff's claim that the chancellor was an impartial decision maker, the court stated at page 240:

"The initial decision obviously had to be made by someone and the chancellor was a wholly appropriate choice."

There is nothing in that case, however, to suggest a potential for bias or partiality as in the case at bar and thus it is inapposite.

The respondents and amici curiae argue that the existence of postdetermination review procedures ameliorate any partiality in the original determination. An

analysis of the two procedures suggested, however, reveals their inadequacy. The first is the common-law writ of certiorari. The scope of review by certiorari is limited to determining:

"... '... (1) Whether the board kept within its jurisdiction; (2) whether it proceeded on correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question.'" *State ex rel. Ball v. McPhee* (1959), 6 Wis. 2d 190, 199, 94 N. W. 2d 711. *See also: State v. Goulette* (1974), 65 Wis. 2d 207, 222 N. W. 2d 622.

The second suggested procedure—review by the Wisconsin Employment Relations Commission under sec. 111.70 (4), Stats. Such procedure applies only in the case of employee prohibited practices, however. Neither of these alternatives provide for review to determine whether another course of action such as mediation, injunction, continued collective bargaining or arbitration would have been a more reasonable response on the part of the decision maker. In light of that fact, it is difficult to see how either review by common-law certiorari or by the WERC [3] can replace an impartial decision maker in the first instance.

When the teachers went on strike, the school board was undoubtedly faced with a situation that needed immediate attention. Clearly, it had a duty to keep the schools open and staff them with competent teachers. If the schools were closed so that the statutory minimum number of school days was not reached, monetary state school aid would have been denied or jeopardized leading to a severe budget crisis. True, it could have sought an

[3] *But see: Muskego-Norway C. S. J. S. D. No. 9 v. W. E. R. B.* (1967), 35 Wis. 2d 540, 151 N. W. 2d 617.

injunction or gone to the WERC for some relief, but neither the courts nor the WERC could hire or fire teachers. Sec. 118.22 (2), Stats., provides in part: "No teacher may be employed or dismissed except by a majority vote of the full membership of the board."

Assuming the school board did recognize, under this factual background, that it was not an impartial decision maker or hearing officer as constitutionally contemplated, where was it to go to obtain an authorized impartial hearing officer or decision maker? The answer is that the law as it presently exists does not provide for one. Legislation could establish a necessary forum and procedures directly or by delegation to a proper department of government, but it does not.

When an adequate remedy or forum does not exist to resolve disputes or provide due process, the courts, under the Wisconsin Constitution,[9] can fashion an adequate remedy.

The plaintiffs-appellants contend that part of sec. 118.22 (2), Stats., which gives the school the exclusive right to hire and fire, is unconstitutional in that it denies due process. If the statute can be construed or procedures provided to meet a valid constitutional objection, it should be done.

We believe the school board should make the initial determination as to the hiring or firing of one or many teachers. In those situations where due process is re-

[9] Art. I, sec. 9, Wis. Constitution, states: "Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws." *See also: State ex rel. Wickham v. Nygaard* (1915), 159 Wis. 396, 150 N. W. 513; *Wisconsin Telephone Co. v. Public Service Comm.* (1939), 232 Wis. 274, 287 N. W. 122, 287 N. W. 593; *Huebner v. State* (1967), 33 Wis. 2d 505, 147 N. W. 2d 646.

quired, namely where the employed teacher's property right or liberty is at stake—notice, a hearing and a statement of reasons should be given. As much control as possible should be left with the school board to set policy and manage the school.

In those situations where an employed teacher is discharged or otherwise disciplined and due process is required, and the school board is in an adversary position, we hereby provide and direct that the dissatisfied teacher or teachers can, upon petition, obtain a de novo determination of all issues in any court of record in the county where the school district or a part of it is located. The issues shall be determined by the court without a jury, unless the judge determines to call a jury and receive an advisory verdict. The court shall resolve any factual disputes and provide for a reasonable disposition.

The trial of the contested issues shall be given a trial date preference consistent with the reasonable administration of the court's calendar.

This method of disposition is not ideal because a court may be required to make public policy decisions that are better left to a legislative or administrative body. However, because a fundamental constitutional protection is involved and no adequate forum exists, we fashion this remedy. It will be available to teachers [10] until such time and only until such time as the legislature provides a means to establish a forum that will meet the requirements of due process.

This procedure just announced requires that we reverse the trial court's summary judgment and that the matter be remanded to the trial court with the right of the parties to amend their pleadings so as to bring the necessary issues before the trial court.

---

[10] This remedy is limited to public school teachers because we deal here with a specific school teacher statute, sec. 118.22 (2).

The appellants also assert that the action of the board of education, wherein it decided to discharge the striking teachers, was in violation of the open meeting law.

This issue was raised in the appellants' third cause of action in the amended complaint filed in the trial court.

Paragraph 15 of the amended complaint provides:

"On April 2, 1974, the Board, its administrators and agents, met and held a special meeting at which they considered, decided and acted to terminate the employments of the plaintiffs and other teachers similarly situated. No notice of said special meeting was ever given to the plaintiffs, or any other teachers similarly situated nor to the public."

The open meeting law, sec. 66.77, Stats., provided in part, prior to June 15, 1974:

"(2) To implement and insure the public policy herein expressed, all meetings of all state and local governing and administrative bodies, boards, commissions, committees and agencies, including municipal and quasi-municipal corporations, unless otherwise expressly provided by law, shall be publicly held and open to all citizens at all times, except as hereinafter provided. No formal action of any kind, except as provided in sub. (3), shall be introduced, deliberated upon or adopted at any closed session or closed meeting of any such body, or at any reconvened open session during the same calendar day following a closed session. No adjournment of a public meeting into a closed session shall be made without public announcement of the general nature of the business to be considered at such closed session, and no other business shall be taken up at such closed session.

"(3) Nothing herein contained shall prevent executive or closed sessions for the purposes of:

"(a) Deliberating after judicial or quasi-judicial trial or hearing;

"(b) Considering employment, dismissal, promotion, demotion, compensation, licensing or discipline of any public employe or person licensed by a state board or

commission or the investigation of charges against such person, unless an open meeting is requested by the employe or person charged, investigated or otherwise under discussion."

The trial court sustained a demurrer to the third cause of action of the complaint, concluding that the meeting of the board fell within exceptions (3) (a) and (b) of the statute. With respect to (3) (b), the court noted that the complaint failed to allege that any employee had requested an open meeting.

The appellants' argument centers around the failure of the board to give any notice of the meeting. They contend that exception (3) (a) does not apply because deliberations after a "judicial or quasi-judicial trial or hearing" necessarily amounts to an "adjournment of a public meeting into a closed session," and therefore requires a public announcement or notice. No authority is cited for that proposition and we believe the language of the statute permits no such interpretation.

With respect to sub. (3) (b), the appellants contend that they are foreclosed from requesting an open meeting because notice that the meeting was to be held was never given. First, it must be noted that the statute (prior to June 15, 1974) did not require that notice be given. More importantly, however, paragraph 5 of the amended complaint, which is specifically incorporated by reference into the third cause of action, clearly states that the board "notified the employees that the Board was considering taking action against their then current teaching contracts." In light of such allegation, which is borne out by other parts of the record, the appellants' contention that they had no opportunity to request an open meeting is without foundation. We conclude the demurrer to the third cause of action was properly sustained.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion. Order affirmed. No costs to be taxed.

ROBERT W. HANSEN, J. *(concurring).* School boards in this state are directed by statute to contract for the services of qualified teachers in their schools.[1] School teachers in this state are employees of such school boards and stand "in a contract relation."[2] Except as otherwise provided by statute,[3] or constitutionally required,[4] the

[1] Sec. 118.21 (1), Stats., providing: "The school board shall contract in writing with qualified teachers. . . ."

[2] *State ex rel. O'Neil v. Blied* (1925), 188 Wis. 442, 446, 206 N. W. 213, holding: "One engaged in teaching in this state and whose services are to be paid for in whole or in part by the state school fund . . . stands in a contract relation . . . ."

[3] *See: Muskego-Norway C. S. J. S. D. No. 9 v. W. E. R. B.* (1967), 35 Wis. 2d 540, 557, 151 N. W. 2d 617, holding sec. 111.70 (3) (a), Stats., to prohibit municipal employers, including school districts, from " '1. Interfering with, restraining or coercing any municipal employe in the exercise of the rights provided in sub. 2.

" '(2) Encouraging or discouraging membership in any labor organization, employe agency, committee, association or representation plan by discrimination in regard to hiring, tenure or other terms or conditions of employment.' "

*See also:* Sec. 119.42, Stats., establishing teacher tenure or permanent appointment after three years of continuous teaching service, but applying only to cities of the first class. As to status under tenure law, *see: State ex rel. Thompson v. School Directors* (1923), 179 Wis. 284, 288, 191 N. W. 746, citing *State ex rel. Murphy v. Board of Trustees* (1918), 168 Wis. 238, 169 N. W. 562.

[4] *See: Alston v. School Board of City of Norwalk* (4th Cir. 1940), 112 Fed. 2d 992, holding that the right of a negro teacher to declaratory or injunctive relief against the practice of a school board in fixing salaries for negro teachers at a lower scale than for white teachers is not waived, or otherwise precluded, by the fact that the negro teacher has entered into a contract with the school board for the current year to perform teaching services. (Certiorari denied in 311 U. S. 693, 61 Sup. Ct. 75, 85 L. Ed. 448.)

entire relationship between a school board and a school teacher derives from the contract between them.[5]

The school board in Hortonville had entered into such contractual relationship with each of its school teacher employees for the school year, 1973–1974. Each such personal service contract fixed the salary, determined the services to be performed and set the term or period of employment. Each such contract incorporated into it "the last collective bargaining agreement," the 1972–1973 master contract, between the Hortonville school board and the Hortonville education association.[6] When the Hortonville teachers went on strike, they were teaching under contract, not after their contracts had expired.[7] When they failed to appear at the school to perform their duties under the contract, it became the duty of the school board to conduct an "inquiry into the question of the failure of a teacher to perform his contract obligation" and in case of such breach "to take such steps as may be necessary to carry out the purposes of the school." [8]

---

[5] *Board of Education of South Milwaukee v. State ex rel. Reed* (1898), 100 Wis. 455, 462, 76 N. W. 351, holding: ". . . the relations and obligations between the relator . . . and the high school board of said district were purely and strictly of a contractual character. . . ."

[6] "It is Further Agreed, that this contract incorporates herein by reference, to have the same effect as if made a part thereof of the last collective bargaining agreement entered into by and between the Hortonville Education Association, and said School Board, dated May 8, 1972, and is subject to all terms and conditions of such collective bargaining agreement. . . ." (Individual contract, March 12, 1973.)

[7] As to "minimal procedural safeguards" of sec. 118.22, Stats., applying to teachers not rehired, *see: Richards v. Board of Education* (1973), 58 Wis. 2d 444, 453, 206 N. W. 2d 597.

[8] *Curkeet v. Joint School District* (1914), 159 Wis. 149, 152, 149 N. W. 708, this court holding: ". . . School boards have thereby [sec. 441, Stats. 1913] enjoined upon them very extensive duties in maintaining the common schools and in administering the school affairs. Such duties embrace that of inquiry into the ques-

Facing such duty to ". . . take such steps as may be necessary" to reopen the school, the Hortonville school board acted. It did not go to court (as appellants now claim it should have) to seek an injunction, not only declaring the strike illegal [9] but also ordering the teachers back to the classroom *under the contract*. It could have chosen this route, but was not required so to elect. Neither did the school board prefer charges of misconduct against the teachers, seeking their "discharge for cause" *under the contract*.[10] It could have taken this approach, but it is clear that it did not bring charges of misconduct *under the contract*. Instead, what the Hortonville school board did was to rescind or terminate the personal service contracts as to all teachers who elected to remain on strike. (The dissenting-in-part opinion terms this ". . . an acceptance of the breach of contract by the teachers," which is another way of saying the same thing.)

tion of the failure of a teacher to perform his contract obligation as a teacher, and if they find that a teacher has breached his contract it is their duty to take such steps as may be necessary to carry out the purposes of the school, and if a teacher has failed to perform his duties under his contract they can discharge him from further service. . . ."

[9] *See:* Sec. 111.70 (4) (1), Stats. (upheld as constitutionally valid, applied to teachers, by majority opinion here), provides: *"Strikes prohibited.* Nothing contained in this subchapter shall constitute a grant of the right to strike by any county or municipal employe and such strikes are hereby expressly prohibited."

[10] *Scott v. Joint School District* (1881), 51 Wis. 554, 557, 8 N. W. 398, this court holding: ". . . We think the school board . . . have the power to close the school and discharge the teacher for just cause. . . ." As to scope of judicial review of such discharge for just cause, *see: Clark v. Blochowiak* (1942), 241 Wis. 236, 239, 5 N. W. 2d 772, holding, where board of vocational education discharged for cause a supervisor of its dental clinic after a hearing, that, on certiorari to review the action taken by the board, ". . . the only matter the court could properly consider was whether on the evidence properly received by the board the charges against the plaintiff were sustained."

The communication sent each teacher by the board stated that the board had been informed by its superintendent of schools that, "You have breached your individual employment contract; You have engaged in an unlawful strike contrary to Wisconsin law." [11] The communication set a time and place for hearings as to whether the individual teacher had breached the employment contract, and noted that possible board action, if the facts established such breach, included ". . . termination of your employment contract." [12] A subsequent resolution, adopted by the school board, terminated the employment relationship as to teachers who had been thus notified or who had waived notice of their ". . . alleged breach of employment contract and participation in an unlawful strike." [13] To the writer it appears clear that the school board, by thus terminating the employer and employee relationship on the ground of a major breach of such contract by the striking teachers, was rescinding the contracts of personal service as to all teachers who did not return to their teaching assignments.

A contract, including a personal service contract,[14] remains in force in accordance with its terms, unless one party to it ". . . acts inconsistently with the duty imposed upon him by the contract, which amounts to an abandonment . . . ." [15] However, it is not every breach of a contract consisting of failure to perform exactly that entitles the other party to rescission. Our court

[11] Letter from Roger Weihing, President, for the Board of Education to individual teachers, March 29, 1974.

[12] *Id.*

[13] Resolution, Adopted by the Board of Education, April 2, 1974.

[14] 68 Am. Jur. 2d, *Schools*, p. 475, sec. 143, stating: "The principles governing contracts generally are applicable to contracts for the employment of teachers. Thus, such a contract is considered one for personal services and, where entered into for a definite term, is an entire contract for the period covered."

[15] 17 Am. Jur. 2d, *Contracts*, p. 951, sec. 482.

has held that, before a party not in default may be entitled to relief of rescission, there must be "so serious a breach of the contract by the other party as to destroy the essential objects of the contract." [16] Or, as another court has phrased it, the failure of performance, in order to constitute a ground for rescission, must be total, "such as to defeat the object of the contract or render it unattainable." [17] The claim of right to terminate and rescind its contracts with its teachers on ground of breach of contract was properly assertable by the Hortonville school board. But the determination of whether the claimed breach of contract constituted ground for such rescission was here for a court to decide.

With the school board action found to be a rescission of contract, based on claim of teacher breach of contract, it follows that either party to the contract had right of recourse to the courts for a judicial determination of whether the breach warranted the rescission. [18] With the multiple cancellations of personal service contracts involved in an area of vital public concern, in the case before us the legal remedy is obviously inadequate, and the aid of a court of equity is required. [19] It follows that the school board here might have sought by application to a court of equity a judicial affirmation of its action in

[16] *Hoffmann v. Danielson* (1947), 251 Wis. 34, 38, 27 N. W. 2d 759, this court holding: ". . . Before a party not in default may be entitled to the relief of rescission, there must be so serious a breach of the contract by the other party as to destroy the essential objects of the contract. . . ."

[17] *Ellison, Son & Co. v. Grocery Co.* (1911), 69 W. Va. 380, 387, 71 S. E. 391, stating the rule to be: " 'Generally the failure of performance, in order to constitute a ground for rescission, must be total; such as to defeat the object of the contract or render it unattainable. . . .' " Quoting 24 Am. & Eng. Ency. L. 644.

[18] 17 Am. Jur. 2d, *Contracts*, p. 979, sec. 503, stating: "Although contracts do not terminate as a matter of course on a breach, they may be terminable therefor. . . ."

[19] *See:* 17 Am. Jur. 2d, *Contracts*, p. 955, sec. 485.

rescinding the employment contracts on ground of serious breach of contract by the teachers. Certainly the teachers, all or any one of them, are also entitled to challenge in a court of equity the action taken by the board. In either event, the issue for the court to determine is whether the breach of their contracts by the teachers under the circumstances,[20] was such as to warrant the school board's action in terminating their employment and rescinding their contracts. The test is the *Hoffmann Case* test.[21] In the posture of this case, the teachers have instituted equity proceedings, but not for the purpose above set forth. However, with an opportunity to amend such petition or pleadings granted, the proceedings instituted can be amended to present this issue and permit a judicial determination as to whether the teacher conduct, under the circumstances, justified the school board action.

Also on appeal to this court is the challenge to an order of the county court of Outagamie county, the Honorable R. THOMAS CANE, presiding, which included orders that the school board submit a list of discharged teachers whom the board "would offer positions back" for the balance of the 1973–1974 school year, that the board offer striking teachers positions for the balance of the 1973–1974 school year ". . . if and when vacancies arose," and that striking teachers offered a vacancy for the remainder of the 1973–1974 school year accept such offer. The basic issue on appeal appears to be the juris-

---

[20] 17 Am. Jur. 2d, *Contracts,* p. 977, sec. 501, stating: "No hard and fast rule exists as to the right of rescission for cause; the right usually depends on the circumstances of the particular case. . . ." *See also:* 17 Am. Jur. 2d, *Contracts,* p. 980, sec. 503, stating: ". . . Moreover a party seeking to rescind must show that he was free from default in relation to the obligation which he claims the other party failed to perform. . . ." *See also:* As to violations of contract held not to justify rescission: *E. L. Husting Co. v. Coca-Cola Co.* (1931), 205 Wis. 356, 237 N. W. 85, 238 N. W. 626.

[21] *Hoffmann v. Danielson, supra,* footnote 16.

diction of the county court, sitting in equity, to issue the order. The board initiated the proceedings involved, seeking a court order limiting picketing activity. Without comment on the issues raised on such appeal, pro or con, the writer considers it unfortunate that such appeal (No. 133, August Term, 1974) was not consolidated with the appeal here, so that all aspects of judicial proceedings involving the Hortonville teachers' strike could have, at one time and in one opinion, been considered and determined.

On this appeal, however, applying the law to the facts, the writer would: (1) Concur in the majority holding that the no strike by county or municipal employees' statute, sec. 111.70 (4) (l), Stats., is constitutionally valid; (2) concur in the majority holding that the open meeting law was not here violated; and (3) concur in the majority holding for reversal and remand but would limit the scope and purpose of such remand, with appellants here granted leave to amend their petition within thirty days, the petition to be amended to raise and present for judicial determination the issue of whether the acts of the teachers, under these circumstances, justified the school board in rescinding the employment contracts and terminating employment.

HANLEY, J. *(concurring in part; dissenting in part).*

I concur with the majority's conclusion that the demurrer to the third cause of action relating to the alleged violation of the open meeting law was properly sustained.

I respectfully dissent to the majority's ruling reversing the trial court's granting of summary judgment on the first cause of action.

Sec. 111.70 (4) (l), Stats., provides as follows:

"*Strikes prohibited.* Nothing contained in this subchapter shall constitute a grant of the right to strike by any county or municipal employe and such strikes are hereby expressly prohibited."

The above provision means exactly what it states. Therefore, the action of the teachers, acting in concert, in refusing to report for work cannot be sanctioned as a strike either by this court, the school district, the teachers' union or the teachers. The action of the teachers constitutes a unilateral breach of employment.

On April 2, 1974, the board held a special meeting at which it adopted a resolution terminating the employment of the teachers who refused to report for work. Such action was an acceptance of the breach of contract by the teachers. With that acceptance, all employment relations between the board and the teachers terminated. Upon that termination any action on the part of the board relative to discharge was superfluous. There is no issue to be tried.

I would affirm the judgment.

I am authorized to state that Mr. Justice CONNOR T. HANSEN joins in this concurrence-dissent.

The following memorandum was filed March 28, 1975.

PER CURIAM *(on motions for rehearing)*. The last sentence on page 482, continuing on page 483 of 66 Wis. 2d 469, is revised as follows:

"Whether the master contract between the board and the Hortonville Education Association and the contracts between the individual school teachers and the board are comparable to contracts involved in other cases where striking teachers were disciplined or discharged cannot be determined from the record in this case."

Motions for rehearing are denied without costs.